UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ROCHELLE GREEN, et al.,

                              Plaintiffs,

- against -

CITIMORTGAGE, INC., et al.,

                              Defendants.
----------------------------------------------------------X

**OPINION AND ORDER**
**13 CV 2341 (SJF)(AKT)**

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ DEC 18 2013 ★

LONG ISLAND OFFICE

FEUERSTEIN, J.

On April 17, 2013, twenty-six (26) named plaintiffs, and one hundred (100) "John Roe" plaintiffs[1], commenced this action against defendants CitiMortgage, Inc.; Nationstar Mortgage, LLC; Bank of America, N.A.; U.S. Bank, N.A.; JPMorgan Chase Bank, N.A.; Wells Fargo Bank, N.A.; PNC Bank N.A.; and Ocean First Bank pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1332(a).[2] On September 3, 2013, those same plaintiffs filed an amended complaint

---

[1] Plaintiffs allege that their counsel "is aware of and has provided services to unnamed ROE Plaintiffs, each of whom sustained actual injury. The unnamed ROES sue under their names fictitiously because they either wish to maintain their privacy or because Plaintiffs' counsel have [sic] not completed the due diligence necessary to properly plead their claims as of the filing of this Complaint. From time-to-time, upon conducting the due diligence and learning the information sufficient to add remaining ROE Plaintiffs to this action, Plaintiffs shall seek leave of Court to amend this Complaint to name these additional ROE Plaintiffs, or will follow such other process as is proscribed [sic] by the Court." (Amended Complaint ["Amend. Compl."], ¶ 87).

[2] This Court does not have diversity jurisdiction under 28 U.S.C. § 1332(a) because: (1) plaintiff Rochelle Green ("Green") and defendant JPMorgan Chase Bank, N.A. ("JP Morgan Chase") are both citizens of the State of New York, (Amend. Compl., ¶¶ 61, 94); (2) plaintiff Jeffery Wiltz ("Wiltz") and defendant Bank of America, N.A. ("BofA") are both citizens of the State of North Carolina, (Amend. Compl., ¶¶ 74, 92); (3) plaintiffs Ena Bishop ("Bishop"), Michael Pineno ("Pineno") and Diana Rodriguez ("Rodriguez") and defendant Ocean First Bank ("Ocean First") are all citizens of the State of New Jersey, (Amend. Compl., ¶¶ 76-78, 97); (4) plaintiffs Todd Petkac ("Petkac") and Nickolas Winblad ("Winblad") and defendant U.S. Bank,

1

against defendants, *inter alia*, adding Frank Mustari ("Mustari") as a twenty-seventh plaintiff and alleging violations of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601, *et seq.*, and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.*, as well as state law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, fraudulent concealment, fraud, violations of multiple state consumer protection statutes, unjust enrichment and fraudulent inducement. For the reasons set forth below, the claims of all plaintiffs except the first-named plaintiff, Green, are *sua sponte* severed from this action pursuant to Rule 21 of the Federal Rules of Civil Procedure and dismissed without prejudice to commencing separate actions for each mortgage serviced by defendant.

---

N.A. ("US Bank") are all citizens of the State of Ohio, (Amend. Compl., ¶¶ 79, 80, 93); (5) plaintiff Wanda Rodgers ("Rodgers") and defendant PNC Bank, N.A. ("PNC") are both citizens of the State of Pennsylvania, (Amend. Compl., ¶¶ 81, 96); and (6) plaintiff Jackie Hammond ("Hammond") and defendant Nationstar Mortgage, LLC ("Nationstar") are both citizens of the State of Texas, (Amend. Compl., ¶¶ 83, 91). See Wachovia Bank v. Schmidt, 546 U.S. 303, 318, 126 S. Ct. 941, 163 L. Ed. 2d 797 (2006) (holding that for purposes of diversity jurisdiction, a national banking association is a citizen of "the State designated in its articles of association as its main office."); Lincoln Property Co. v. Roche, 546 U.S. 81, 89, 126 S. Ct. 606, 163 L. Ed. 2d 415 (2005) (holding that diversity jurisdiction "require[s] complete diversity between all plaintiffs and all defendants."); Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 42 (2d Cir. 2000) ("An individual's citizenship * * * is determined by his domicile. * * * Domicile is the place where a person has his true fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning." (quotations and citations omitted)); In re Balfour MacLaine International Ltd., 85 F.3d 68, 76 (2d Cir. 1996) ("A corporation has dual citizenship for purposes of a federal court's diversity jurisdiction under 28 U.S.C. § 1332; namely, it is a citizen of the state of its incorporation and of the state where it has its principal place of business.") Nonetheless, since two (2) federal claims are present on the face of the amended complaint, this Court has independent subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." See In re Egri v. Town of Haddam, 68 Fed. Appx. 249, 255 (2d Cir. July 1, 2003) (summary order).

I. Background

    A.  Factual Background

The amended complaint alleges, *inter alia*, the following:

Defendants have serviced the respective mortgages of each plaintiff "[f]or a period ranging from months to several years prior to the commencement of this action[.]" (Amend. Compl., ¶ 1).³ Each plaintiff defaulted on his or her mortgage, id., and requested a loan

---

³ (1) Green (a) owns premises on Auerbach Lane in Lawrence, New York, (b) executed promissory notes to Nationstar and CitiMortgage secured by mortgages against those premises and (c) applied for loan modification from CitiMortgage "in late 2010," (Amend. Compl., ¶ 61); (2) plaintiff James Agard ("Agard") (a) owns premises on High Street in Canaan, Connecticut, (b) executed a promissory note to BofA, secured by a mortgage against those premises and (c) applied for loan modification from BofA on or about January 2013, (Amend. Compl., ¶ 62); (3) plaintiff Carey St. Martin ("St. Martin") (a) owns premises on Green Manor Road in Enfield, Connecticut, (b) executed a promissory note to CitiMortgage secured by a mortgage against those premises and (c) applied for loan modification from CitiMortgage on or about November 2012, (Amend. Compl., ¶ 63); (4) plaintiff Jacquelyn Simmons ("Simmons") (a) owns premises on Pineda Drive in Orlando, Floria, (b) executed a promissory note to US Bank, secured by a mortgage against those premises and (c) applied for loan modification from US Bank on or about April 2013, (Amend. Compl., ¶ 64); (5) plaintiff Michael Frier ("Frier") (a) owns premises on SE Akita Road in Brandford, Florida, (b) executed a promissory note to US Bank secured by a mortgage against those premises and (c) applied for loan modification from US Bank on or about August 2012, (Amend. Compl., ¶ 65); (6) plaintiff Robert Leary ("Leary") (a) owns premises on Culvers Drive in Sandpoint, Idaho, (b) executed a promissory note to US Bank secured by a mortgage against those premises and (c) applied for loan modification from US Bank on or about June 2013, (Amend. Compl., ¶ 66); (7) plaintiff Rodney Roberts ("Roberts") (a) owns premises on Ray Avenue in Caldwell, Idaho, (b) executed a promissory note to CitiMortgage secured by a mortgage against those premises and (c) applied for loan modification from CitiMortgage on or about March 2013, (Amend. Compl., ¶ 67); (8) plaintiff Barbara Moffett ("Moffett") (a) owns premises on Canyon View Lane in Joliet, Illinois, (b) executed a promissory note to US Bank secured by a mortgage against those premises and (c) applied for loan modification from US Bank "multiple times, including in late 2008," (Amend. Compl., ¶ 68); (9) plaintiff Joseph Ward ("Ward") (a) owns premises on Stamford Court in Schaumburg, Illinois, (b) executed a promissory note to CitiMortgage secured by a mortgage against those premises and (c) applied for loan modification from defendant "in early 2012," (Amend. Compl., ¶ 69); (10) plaintiff Darnell Brooks ("Brooks") (a) owns premises on Exchange Avenue in Calumet City, Illinois, (b) executed a promissory note to CitiMortgage secured by a mortgage against those premises and

3

(c) applied for loan modification from JP Morgan Chase "multiple times, including in late 2010," (Amend. Compl., ¶ 70); (11) plaintiff Diana Roser ("Roser") (a) owned premises on Motter Station Road in Rocky Ridge, Maryland until such property was sold in foreclosure on July 10, 2013, (b) executed a promissory note to Wells Fargo Bank, N.A. ("Wells Fargo") secured by a mortgage against those premises and (c) applied for loan modification from Wells Fargo "multiple times, including in late 2011," (Amend. Compl., ¶ 71); (12) plaintiff Nathaniel Riley ("Riley") (a) owns premises on Jameson Street in Temple Hills, Maryland, (b) executed a promissory note to National City Mortgage, which was later acquired by PNC, secured by a mortgage against those premises and (c) applied for loan modification from PNC "multiple times, including on or about December 2007," (Amend. Compl., ¶ 72); (13) plaintiff Ronald Skidgel ("Skidgel") (a) owns premises on Arch Street in Malden, Massachusetts, (b) executed a promissory note to US Bank secured by a mortgage against those premises and (c) applied for loan modification from US Bank "multiple times, including in late 2008," (Amend. Compl., ¶ 73); (14) Wiltz (a) owns premises on Passour Ridge Lane in Charlotte, North Carolina, (b) executed a promissory note to CitiMortgage secured by a mortgage against those premises and (c) applied for loan modification from CitiMortgage "in late 2010," (Amend. Compl., ¶ 74); (15) plaintiff Lawrence Hilton ("Hilton") (a) owns premises on Bound Tree Road in Hopkinton, New Hampshire, (b) executed a promissory note to CitiMortgage secured by a mortgage against those premises and (c) applied for loan modification from CitiMortgage "in the Fall of 2011," (Amend. Compl., ¶ 75); (16) Bishop (a) owns premises on Red Feather Trail in Browns Mills, New Jersey, (b) executed a promissory note to CitiMortgage secured by a mortgage against those premises and (c) applied for loan modification from CitiMortgage "in late 2011," (Amend. Compl., ¶ 76); (17) Pineno (a) owns premises on Willow Court in Manahawkin, New Jersey, (b) executed promissory notes to Ocean First and CitiMortgage secured by mortgages against those premises and (c) applied for loan modification from Ocean First "in late 2010," (Amend. Compl., ¶ 77); (18) Rodriquez (a) owns premises on Buckhorn Drive in Belvidere, New Jersey, (b) executed a promissory note to CitiMortgage secured by a mortgage against those premises and (c) applied for loan modification from CitiMortgage "in late 2012," (Amend. Compl., ¶ 78); (19) Petkac (a) owns premises on Mapleway Drive in Olmsted Falls, Ohio, (b) executed a promissory note to CitiMortgage secured by a mortgage against those premises and (c) applied for loan modification from CitiMortgage "in 2011," (Amend. Compl., ¶ 79); (20) Winblad (a) owns premises on E. Main Street in Tipp City, Ohio, (b) executed a promissory note to CitiMortgage secured by a mortgage against those premises and (c) applied for loan modification from CitiMortgage on or about November 2012, (Amend. Compl., ¶ 80); (21) Rodgers (a) owns premises on Tom Avenue in Ephrata, Pennsylvania, (b) executed a promissory note to CitiMortgage secured by a mortgage against those premises and (c) applied for loan modification from CitiMortgage on or about December 2012, (Amend. Compl., ¶ 81); (22) plaintiff Mark Smith ("Smith") (a) owns premises on Club Gate in Bluffton, South Carolina, (b) executed a promissory note to US Bank secured by a mortgage against those premises and (c) applied for loan modification from US Bank "multiple times, including in late 2011," (Amend. Compl., ¶ 82); (23) Hammond (a) owned premises on Buescher Court in Pearland, Texas until such property was sold in a short sale, (b) executed a promissory note to CitiMortgage secured by a mortgage against those premises and (c) applied

modification through one of the defendants. (Amend. Compl., ¶¶ 1-2). According to plaintiffs, defendants only allow loan relief or a loan modification upon a default. (Amend. Compl., ¶¶ 2, 31).

Defendants ignored some of the plaintiffs' requests for loan relief or loan modification, but provided some of the plaintiffs with a modification application package requiring them, *inter alia*, "to provide allegedly necessary documentation to process the modifications as one of their obligations of the modification agreement." (Amend. Compl., ¶ 3). According to plaintiffs, defendants "represented to [each plaintiff provided a modification application package] that following the submission and review of a completed modification package, [he or she] would be given terms to make payments as part of a trial modification." (Amend. Compl., ¶ 4). Plaintiffs allege that if they "made the necessary monthly payments under the terms of the trial modification, a permanent modification would be perfected." Id.

According to plaintiffs, each of them accepted defendants' respective loan modification offer to him or her "and worked to meet the terms required of [him or her], expecting Defendants to be bound to perform their obligation of granting a permanent modification." (Amend. Compl.,

---

for loan modification from CitiMortgage on or about January 2013, (Amend. Compl., ¶ 83); (24) plaintiff Mikki Keller ("Keller") (a) owns premises on N.E. 22nd Avenue in Camas, Washington, (b) executed a promissory note to CitiMortgage secured by a mortgage against those premises and (c) applied for loan modification from CitiMortgage "multiple times, including in late 2012," (Amend. Compl., ¶ 84); (25) plaintiff Cheryl Wolf ("Wolf") (a) owns premises on N.E. 181st Place in Woodinville, Washington, (b) executed a promissory note to CitiMortgage secured by a mortgage against those premises and (c) applied for loan modification from CitiMortgage on or about February 2013, (Amend. Compl., ¶ 85); and (26) Mustari (a) owns premises on Juniper Lane in Bloomingdale, Illinois, (b) executed a promissory note to US Bank secured by a mortgage against those premises and (c) applied for loan modification from US Bank on or about August 2012, (Amend. Compl., ¶ 86). No information is provided about Rishi Bunsee ("Bunsee"), one of the plaintiffs named in the caption of the amended complaint.

5

¶ 5). Each plaintiff "either provided all of the requested documentation in support of [his or her] loan modification application to Defendants, and otherwise met all the conditions precedent pursuant to a trial modification offer, or attempted to do so in good faith, but faced substantial interference from Defendant [sic]." (Amend. Compl., ¶ 7).

Some plaintiffs did not meet all of defendants' conditions precedent because defendants purportedly "put in place procedural safeguards to make the modification process as onerous and complicated as possible, shepherding [those] Plaintiffs into foreclosure, even going so far as providing conflicting information to [them] regarding which information was received or still needed." (Amend. Compl., ¶ 8). Plaintiffs allege that "Defendants [sic] policy was to intentionally delay the application and documentation process so that documents had to be resubmitted and deadlines passed." Id.

Some plaintiffs, including Smith, Roser and Keller, provided all of the required information and documentation to defendants, but "Defendants still sent missing documentation requests, which often included documents previously sent by [those] Plaintiffs." (Amend. Compl., ¶ 9). Those plaintiffs again provided the requested documents to defendants, sometimes multiple times. Id. Plaintiffs allege that defendants' "missing document requests constituted a policy to interfere with and overly burden Plaintiffs' compliance with modification terms, and were a result of deficient protocols within Defendants' loan modification operations." (Amend. Compl., ¶ 11).

Some plaintiffs who "had accepted Defendants' offers [for loan modifications]," (Amend. Compl., ¶ 10), including Winblad, St. Martin and Agard, had their original offers rescinded by

6

defendants, including CitiMortgage and BofA, and were given "new offers with different terms." Id.

Some plaintiffs, including Petkac and Rodriguez, "were denied trial modifications [and even loan modification packages] on baseless claims that their financial status precluded them from being considered for a modification." (Amend. Compl., ¶ 12). "In cases where trial terms were not given, Defendants either gave no explanation for the denial, or alleged that [those] Plaintiffs did not provide the necessary documentation for processing or review," (Amend. Compl., ¶ 13), "even when the modification package was complete," (Amend. Compl., ¶ 16). Plaintiffs allege that "Defendants' belief that conditions precedents [sic] were not satisfied was based on [their] own conflicting reports and inconsistent status updates, or simply the failure of [their] loss mitigation representatives to adequately conduct document intake." Id.

Some plaintiffs were "given terms to make modification payments on a trial basis," (Amend. Compl., ¶ 14), and "made the required payments under the terms of the offered trial modification." Id. Those plaintiffs "ultimately learned, often only after inquiring, that a permanent modification was not provided." (Amend. Compl., ¶ 15).

Finally, some plaintiffs, including Moffett and Agard, were granted permanent modifications, but defendant purportedly "included such disadvantageous terms that ultimately rendered [those] Plaintiffs' performance impossible." (Amend. Compl., ¶ 18). Those "disadvantageous terms" include "fail[ing] to lower the monthly payment, add[ing] a decade to the term of the loan, or creat[ing] unmanageable balloon payments at the end of the term of the loan." Id.

Plaintiffs allege that "Defendants had no intention to grant a permanent modification, since it was not in [their] financial interest to do so[,] [yet they] nevertheless continued to collect trial payments, stripping as much remaining equity from Plaintiffs as possible, knowing that Plaintiffs were pre-destined for a permanent modification rejection[.]" (Amend. Compl., ¶ 17). According to plaintiffs, "[u]nder [defendants'] [Credit Default Swaps ("CDS")] scheme, [they] only receive reimbursements for their losses if the mortgaged property is sold through foreclosure sale or short sale, but not if the loan is modified." (Amend. Compl., ¶ 20).

Plaintiffs allege that defendants: (1) "have instituted companywide policies ensuring an absence of standards for determining who will be granted Home Affordable Modification Program ('HAMP') loan modifications * * * by [them] * * *," (Amend. Compl., ¶ 26); (2) "drive their inventory of loans into default and eventually foreclosure, allowing them to obtain payment on the undisclosed insurance taken out against the interests of the Plaintiffs and other homeowners/mortgagors," (Amend. Compl., ¶ 28); (3) "evaded requirements * * * to deal with [them] fairly and in good faith toward reasonable loan modification agreements of financially troubled loans, * * *" (Amend. Compl., ¶ 29); (4) "have had, and continue to have, a fraudulent loan modification program, purporting to offer the possibility of a loan modification agreement to the Plaintiffs and other homeowners, while driving [them] into default to enable Defendants to pursue foreclosure against those same homeowners," (Amend. Compl., ¶ 30); and (5) "falsely led [them] and others similarly situated to believe that there was hope for a loan modification agreement and no threat of foreclosure, deterring them through misrepresentation from seeking alternative refinancing for an extended period in which to sell their property at the highest price,"

(Amend. Compl., ¶ 34). As an example, plaintiffs allege that Brooks "received a trial modification offer from Defendant JPMorgan Chase that actually raised his monthly payments by about $400 [four hundred dollars][,] [and] * * * Brooks' home was subsequently foreclosed upon, and is currently pending sale by Defendant JPMorgan Chase." (Amend. Compl., ¶ 29). Plaintiffs allege that they "have the capacity to make monthly payments based on their notes, if those were restructured with a principal amount in line with the present value of the properties and at a lower interest rate, in line with current market rates * * * [and] should have an option to do so * * *." (Amend. Compl., ¶ 23).

Plaintiffs further allege that defendants engaged in "deceptive and predatory lending practices * * * during the origination of [their respective] loans * * * [by] offering loans with terms that would never have been accepted by [them] based on their financial means, had it not been for Defendants' misrepresentation of material terms." (Amend. Compl., ¶ 35). According to plaintiffs, as "further induce[ment]" for them to accept defendants' loans, defendants "assured [each of them] that housing prices would continue to rise and [made] general misrepresentations as to the stability of the housing market." (Amend. Compl., ¶ 36). In addition, plaintiffs allege that defendants: (1) "insufficiently relied upon" "their actual financial documents," (Amend. Compl., ¶ 37); (2) "consistently preyed upon [them] by providing loans unsuitable to [their respective] income at the time, or in the foreseeable future," id.; (3) "intentionally ignored established safeguards meant to ensure the loans were appropriate for the respective borrowers," id.; (4) "often did not require them to provide sufficient documentation * * * to show what the [sic] income was * * * [and] [i]nstead * * * simply accepted the loan applications on the day of

the closing, without offering the proper due diligence required to determine whether [they] were qualified to receive each of their individual loans," (Amend. Compl., ¶ 39); (5) "encouraged certain Plaintiffs to exaggerate their incomes, because [their] underwriting guidelines allowed them to lend higher amounts that way[,] [thus] enabl[ing] Defendants to garner more interest and generate more fees than would otherwise have been possible," (Amend. Compl., ¶ 40); (6) "either negligently or willfully approved Plaintiffs for loans, when it should have been apparent to [their] underwriters that default was a likely outcome," (Amend. Compl., ¶ 41); and (7) "abused their superior bargaining position" by "offer[ing] and recommend[ing] certain loans to [them], while simultaneously assuring that [they] could easily sell or refinance their homes at any time for more favorable terms, if they ever did find themselves in a position where the loan became too difficult to maintain * * *, while simultaneously planning against that fact[,]" (Amend. Compl., ¶ 42), and knowing "that the housing market was due for a severe downturn[,]" (Amend. Compl., ¶ 43). As examples, plaintiffs allege that Agard, Wolf and Simmons all received loans with no documentation of their respective incomes and that those three (3) plaintiffs all "later needed to seek modification of their loans." (Amend. Compl., ¶ 39).

In addition, plaintiffs allege that defendants: (1) failed to disclose to them (a) "the varying nature of the [several types] of [their] offered loans, [and] the individual implications of each type of loan * * *, especially their long-term ramifications, including default and foreclosure[,]" (Amend. Compl., ¶ 45), and (b) "payment information like escrow amounts, or variable payment terms," (Amend. Compl., ¶ 52); (2) "marginalized how the negative amortization feature [of their adjustable rate pay option loans] could make the loan difficult to refinance, * * * or that there

10

were significant prepayment penalties[,]" (Amend. Compl., ¶ 49); (3) "stressed the [adjustable rate] loan's low payments in the early years * * * and downplayed the inevitable payment shock felt by the borrower when the payments increased[,] * * * despite Defendants' [sic] having no reason to believe that Plaintiffs' income would increase in a similar fashion[,]" (Amend. Compl., ¶ 47); (4) "steered [them] into loans not suitable for their individual financial situations[,]" (Amend. Compl., ¶ 51); and (5) "clearly instituted companywide policies designed to maneuver [them] into [certain] loans regardless of whether they ultimately qualified for them, simply with the goal of obtaining greater profits through adjustable rates, negative amortizations, or higher rates than could be afforded * * *[,]" (Amend. Compl., ¶ 54). As an example, plaintiffs allege that on or about December 2004, Ocean First "induced * * * Pineno into an Option-ARM mortgage[] [and that] * * * Pineno's property is currently under foreclosure." (Amend. Compl., ¶ 53).

Plaintiffs allege that "[u]pon learning of various predatory practices and potentially illegal abuses, [they each] submitted [a] Qualified Written Request[] ("QWR") under [RESPA], 12 USC [sic] § 2605(e) * * *[,]" (Amend. Compl., ¶ 55), to defendants, "formally disput[ing] the validity of their [respective] current debts with Defendants and request[ing] all available information pertaining to their [respective] loans * * *."[4] (Amend. Compl., ¶ 56). According to

---

[4] (1) Green submitted a QWR to both Nationstar and CitiMortgage on or about December 2012, (Amend. Compl., ¶ 61); (2) Agard submitted a QWR to BofA on or about August 2012, (Amend. Compl., ¶ 62); (3) St. Martin and Winblad each submitted a QWR to CitiMortgage on or about September 2012, (Amend. Compl., ¶¶ 63, 80); (4) Simmons and Skidgel each submitted a QWR to US Bank on or about October 2012, (Amend. Compl., ¶¶ 64, 73); (5) Frier and Moffett each submitted a QWR to US Bank on or about November 2012, (Amend. Compl., ¶¶ 65, 68); (6) Leary submitted a QWR to US Bank on or about July 2013, (Amend. Compl., ¶ 66); (7) Roberts, Petkac, Keller and Wolf each submitted a QWR to

plaintiffs, defendants have "failed to sufficiently comply with the QWRs in a meaningful way, or to attempt in any way to resolve the issues about which [they] complained[] [and] * * * also have not provided an adequate reason for their refusal to do so." (Amend. Compl., ¶ 57).

B. Procedural History

On April 17, 2013, twenty-six (26) named plaintiffs, and one hundred (100) "John Roe" plaintiffs, commenced this action against eight (8) defendants, each of whom serviced the mortgages of one (1) or more of the plaintiffs. On September 3, 2013, those same plaintiffs filed an amended complaint against defendants, *inter alia*, adding Mustari as a twenty-seventh named plaintiff and asserting the following claims for relief: (1) breach of contract (Count I), (Amend. Compl., ¶¶ 99-113); (2) breach of the implied covenant of good faith and fair dealing (Count II), (Amend. Compl., ¶¶ 114-118); (3) promissory estoppel (Count III), (Amend. Compl., ¶¶ 119-125); (4) fraudulent concealment (Count IV), (Amend. Compl., ¶¶ 126-139); (5) fraud for demanding and collecting monthly note payments under false pretenses (Count V), (Amend.

---

CitiMortgage on or about November 2012, (Amend. Compl., ¶¶ 67, 79, 84, 85); (8) Ward submitted a QWR to CitiMortgage on or about August 2012, (Amend. Compl., ¶ 69); (9) Brooks submitted a QWR to JP Morgan Chase on or about December 2012, (Amend. Compl., ¶ 70); (10) Roser submitted a QWR to Wells Fargo on or about November 2012, (Amend. Compl., ¶ 71); (11) Riley submitted a QWR to PNC on or about December 2012, (Amend. Compl., ¶ 72); (12) Wiltz, Bishop and Hammond each submitted a QWR to CitiMortgage on or about January 2013, (Amend. Compl., ¶¶ 74, 76, 83); (13) Hilton and Rodriguez each submitted a QWR to CitiMortgage on or about December 2012, (Amend. Compl., ¶¶ 75, 78); (14) Pineno submitted a QWR to Ocean First on or about September 2012, (Amend. Compl., ¶ 77); (15) Rodgers submitted a QWR to CitiMortgage on or about October 2012, (Amend. Compl., ¶ 81); (16) Smith submitted a QWR to US Bank on or about December 2012, (Amend. Compl., ¶ 82); and (17) Mustari submitted a QWR to US Bank on or about August 2012, (Amend. Compl., ¶ 86).

12

Compl., ¶¶ 140-158); (6) violations of multiple state consumer protection statutes (Count VI), (Amend. Compl., ¶¶ 159-184); (7) violations of the TILA (Count VII), (Amend. Compl., ¶¶ 185-196); (8) unjust enrichment (Count VIII), (Amend. Compl., ¶¶ 197-206); (9) fraud in the inducement (Count IX), (Amend. Compl., ¶¶ 207-215); and (10) violations of RESPA (Count X), (Amend. Compl., ¶¶ 216-224). Plaintiffs seek, *inter alia*: (1) specific performance of defendants' purported contractual obligations to each of them; (2) "[a]n order for Defendants to report appropriate corrections to Plaintiffs' records to the three Credit Reporting Agenies (Experian, Equifax and TransUnion)," (Amend. Compl., at p. 47, ¶ C); (3) judgment declaring that defendants are required by the doctrine of promissory estoppel to honor the terms of each plaintiff's respective loan modification agreements "or rules of equity," (Amend. Compl., at p. 47, ¶ D); (4) an injunction permanently enjoining defendants from collecting on his or her respective promissory note; and (4) to recover (a) his or her actual damages "for injuries suffered by [him or her], equity removed for foreclosed properties, and payments not entitled to be received by Defendants," (Amend. Compl., at p. 47, ¶ F), (b) damages "for mental anguish and emotional distress suffered by [him or her] as a result of Defendants' fraudulent modification practices * * *, (Amend. Compl., at p. 47, ¶ G), (c) actual and statutory damages "pursuant to the various state consumer protection statutes," (Amend. Compl., at p. 47, ¶ H), (d) actual damages resulting from defendants' purported TILA violations, (e) actual and treble damages resulting from defendants' purported RESPA violations "and additional damages as the Court may allow in an amount not to exceed $2,000.00 [two thousand dollars] per Plaintiff, for violations of 12 USC [sic] § 2605(e)," (Amend. Compl., at p. 47, ¶ J), and (f) attorney's fees, costs and statutory

13

pre-judgment interest.

II. Discussion

    A. Permissive Joinder of Plaintiffs

Rule 20(a)(1) of the Federal Rules of Civil Procedure permits the joinder of multiple plaintiffs in an action if:

> "(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action."

In determining whether claims relate to, or arise out of, the same "transaction" or "occurrence" under Rule 20(a), "courts are to look to the logical relationship between the claims and determine 'whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'" Kalie v. Bank of America Corp., — F.R.D.—, 2013 WL 4044951, at * 3 (S.D.N.Y. Aug. 9, 2013) (quoting United States v. Aquavella, 615 F.2d 12, 22 (2d Cir. 1979)); see also Abraham v. American Home Mortgage Servicing, Inc., — F. Supp. 2d —, 2013 WL 2285205, at * 3 (E.D.N.Y. May 23, 2013) (Rule (20)(a)(1)); Peterson v. Regina, 935 F. Supp. 2d 628, 638 (S.D.N.Y. 2013) (Rule 20(a)(2)); Deskovic v. City of Peekskill, 673 F. Supp. 2d 154, 166 (S.D.N.Y. 2009) (Rule 20(a)(2)); Barnhart v. Town of Parma, 252 F.R.D. 156, 160 (W.D.N.Y. 2008) (Rule 20(a)(1)). Plaintiffs bear the burden of demonstrating that joinder is proper under Rule 20(a). Kalie, —F.R.D.—, 2013 WL 4044951, at *5; Deskovic, 673 F. Supp. 2d at 159.

Plaintiffs' claims in this case are not properly joined pursuant to Rule 20(a)(1) of the Federal Rules of Civil Procedure. Indeed, judicial economy and fairness dictate that each

14

plaintiff's respective claims be tried separately. This case involves at least twenty-six (26) distinct loans secured by separate properties scattered across fifteen (15) different states, i.e., one (1) in New York, two (2) in Connecticut, two (2) in Florida, two (2) in Idaho, four (4) in Illinois, one (1) in Massachusetts, two (2) in Maryland, one (1) in North Carolina, one (1) in New Hampshire, three (3) in New Jersey, two (2) in Ohio, one (1) in Pennsylvania, one (1) in South Carolina, one (1) in Texas, and two (2) in Washington, (Amend. Compl., ¶¶ 61-86), thus requiring: (a) the application of fifteen (15) different state laws to plaintiffs' claim alleging violations of multiple states' consumer protection laws and (b) convoluted choice-of-law analyses with respect to plaintiffs' seven (7) other state law claims, with the potential of fifteen (15) different state laws being applied to those state law claims as well. Moreover, some of the properties were sold in foreclosure; at least one of the properties was sold in a short sale; and some of the properties were not sold in either foreclosure or a short sale. Other factual disparities include: (1) that each plaintiff (a) separately applied for a distinct type of mortgage loan at different times in different places, (b) submitted different documents and information in support of his or her application to defendants, (c) qualified for his or her loan based upon his or her distinct characteristics, e.g., income, property value, loan amount, etc., (d) received different types of mortgage-backed loans, i.e., some plaintiffs received fixed rate loans while others received adjustable rate loans or adjustable rate pay option loans containing a negative amortization feature, etc., (e) separately applied for loan modifications from one (1) of the eight (8) defendants at different times over a five and a half (5 ½)-year period, i.e., from December 2007 to June 2013, and different places, with some of the plaintiffs applying for only one (1) loan modification and others applying for multiple loan modifications, and (f) separately submitted a distinct QWR to one (1) or more of the eight (8) defendants at different times over an eleven (11) month period, i.e., between August 2012 and July 2013; (2) defendants

allegedly ignored the applications of some of the plaintiffs, but provided other plaintiffs with "a modification application package," (Amend. Compl., ¶ 3); (3) some of the plaintiffs met all of the conditions precedent to receive a trial loan modification offer, but others did not; (4) some of the plaintiffs were nonetheless denied trial modifications "on baseless claims," (Amend. Compl., ¶ 12), while others were given no explanation for the denial of their respective applications; (5) some of the plaintiffs received trial modification offers from defendant, but the terms of those offers differed from plaintiff to plaintiff, and some of the plaintiffs had their original modification offers rescinded by defendants; and (6) some of the plaintiffs even received permanent loan modifications from defendants. Thus, the discrete loan transactions upon which plaintiffs claim a right to relief do not relate to, or arise out of, the "same transaction, occurrence, or series of transaction or occurrences" for purposes of Rule 20(a)(1). See, e.g. Visendi v. Bank of America, N.A., 733 F.3d 863, 870 (9th Cir. 2013) (holding that the claims of one hundred thirty-seven (137) plaintiffs against financial institutions alleging, *inter alia*, deceptive mortgage lending practices were not properly joined because the plaintiffs' interactions with the defendant were not uniform and the "[f]actual disparities * * * [were] too great," i.e., the case involved over one hundred (100) distinct loan transactions, the loans were secured by separate properties scattered across the country and some of the properties, but not all, were sold in foreclosure); Adams v. U.S. Bank, NA, No. 12 CV 4640, 2013 WL 5437060, at * 4 (E.D.N.Y. Sept. 27, 2013) (finding that the plaintiffs, who claimed that various banking and lending institutions, savings corporations and mortgage service providers fraudulently induced them into entering into loans and mortgages and illegally foreclosed on their real property, were improperly joined because their claims involved, *inter alia*, "different facts, different properties located in different states, * * * and different analyses of underlying state law"); Kalie, — F.R.D.—, 2013 WL 4044951, at * 4 (holding that the claims of fifty-two (52)

16

homeowners from sixteen (16) different states against banks and loan servicers alleging, *inter alia*, violations of TILA, RESPA and lending-practices misconduct were not properly joined together); Abraham, 2013 WL 2285205, at * 4 ("[S]eparate loan transactions by different lenders do not constitute a single transaction or occurrence and claims by plaintiffs who engaged in those separate transactions generally cannot be joined in a single action. * * * Indeed, even claims by plaintiffs who engaged in separate loan transactions by the same lender cannot be joined in a single action." (emphasis and citations omitted)). Accordingly, plaintiffs are not properly joined in this action pursuant to Rule 20(a)(1) of the Federal Rules of Civil Procedure.

B. Misjoinder

Rule 21 of the Federal Rules of Civil Procedure provides, in relevant part, that "[m]isjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party." Thus, "[i]f a court concludes that [parties] have been improperly joined under Rule 20, it has broad discretion under Rule 21 to sever [those] parties * * * from the action." Kalie, — F.R.D.—, 2013 WL 4044951, at * 3 (quoting Deskovic, 673 F.Supp.2d at 159-60); see also Adams, 2013 WL 5437060, at * 4.

In determining whether to sever parties improperly joined under Rule 20(a), courts generally consider, in addition to the factors set forth in Rule 20(a), "whether settlement of the claims or judicial economy would be facilitated; [] whether prejudice would be avoided if severance were granted; and [] whether different witnesses and documentary proof are required for the separate claims." Crown Cork & Seal Co., Inc. Master Retirement Trust v. Credit Suisse First Boston Corp., 288 F.R.D. 331, 333 (S.D.N.Y. 2013) (quoting Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd., 806 F. Supp. 2d 712, 720 (S.D.N.Y. 2011)). "A court should consider whether

17

severance will 'serve the ends of justice and further the prompt and efficient disposition of litigation.'" Crown Cork, 288 F.R.D. at 332 (quoting T.S.I. 27, Inc. v. Berman Enters., Inc., 115 F.R.D. 252, 254 (S.D.N.Y. 1987)); see also In re Ski Train Fire in Kaprun, Austria, on November 11, 2004, 224 F.R.D. 543, 546 (S.D.N.Y. 2004).

Joinder of plaintiffs' claims does not serve the interest of judicial economy. See, e.g. Kalie, 2013 WL 4044951, at * 6 ("Inasmuch as each plaintiff's claims appear to arise out of a mortgage-related transaction that is distinct from the transactions on which the other plaintiffs' claims are based, and as each plaintiff's claims implicate distinct loans, locations, dates and personnel, there is no meaningful economy of scale gained by trying the[] cases together.") There will be little, if any, overlapping discovery and each plaintiff's claims will require distinct witnesses and documentary proof. "The interest in economy is affirmatively disserved by forcing these many parties to attend a common trial at which these separate, unrelated claims * * * would be resolved." Id. Furthermore, settlement of the claims is likely to be facilitated if the claims relating to discrete loan transactions are litigated separately. See Adams, 2013 WL 5437060, at * 4 ("[S]ettlement of the claims and judicial economy are likely to be facilitated if the claims [that plaintiffs were fraudulently induced into entering into loans and mortgages and their properties illegally foreclosed upon] are litigated separately in the appropriate state or federal district court.") In addition, "[a] joint trial could lead to confusion of the jury and thereby prejudice [the] defendant[]." Kalie, --- F.R.D.---, 2013 WL 4044951, at * 6 (quotations and citation omitted). Accordingly, all claims by plaintiffs other than Green are *sua sponte* severed pursuant to Rule 21 of the Federal Rules of Civil Procedure and dismissed without prejudice to commencing separate actions for each distinct mortgage serviced by defendants. The statute of limitations for any claim asserted herein is

deemed tolled during the pendency of this action and for a period of thirty (30) days from the date of this Order.

III. Conclusion

For the reasons stated herein, all claims by plaintiffs other than Green are *sua sponte* severed pursuant to Rule 21 of the Federal Rules of Civil Procedure and dismissed without prejudice to commencing separate actions for each distinct mortgage serviced by defendants. The statute of limitations for any claim asserted herein is deemed tolled during the pendency of this action and for a period of thirty (30) days from the date of this Order.

SO ORDERED.

                                    s/ Sandra J. Feuerstein
                                    _____
                                    SANDRA J. FEUERSTEIN
                                    United States District Judge

Dated: December 18, 2013
       Central Islip, N.Y.