```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ROCHELLE GREEN,
                                                                      Case No. 2:13-cv-02341-SJF-AKT
                                    Plaintiff,
                                                                      SECOND AMENDED
            -against-                                                 COMPLAINT

CITIMORTGAGE, INC. & NATIONSTAR                                       JURY TRIAL DEMANDED
MORTGAGE, LLC

                                    Defendant.
------------------------------------------------------------------X
```

## INTRODUCTION

Plaintiff Rochelle Green brings this action against Defendants CitiMortgage, Inc. ("CMI") and Nationstar Mortgage, LLC ("Nationstar"), for illegal actions in the servicing and modification of her home mortgage loans. Plaintiff alleges common law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, fraudulent concealment, and unjust enrichment, as well as statutory claims under New York's General Business Law § 349 and the Real Estate Settlement Procedures Act (RESPA), 12 USC §§ 2601-2617. Plaintiff seeks declaratory and injunctive relief, as well as damages, restitution, and costs. On December 18, 2013, the Court *sua sponte* severed and dismissed without prejudice all plaintiffs, except Rochelle Green. Rochelle Green subsequently dismissed her claims in this subject action with respect to all defendants other than CMI and Nationstar on December 20, 2013. Plaintiff reaffirms her remaining claims against Defendant CMI and Nationstar.

## JURISDICTION AND VENUE

1.  This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, specifically the Real Estate

Settlement Procedures Act (RESPA), 12 USC §§ 2601-2617.  This Court has supplemental jurisdiction over the remaining claims pursuant to 28 USC § 1367.

2.	This Court also has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1332, because this action is between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

3.	This Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged herein took place in New York.  Defendants are authorized to do business in New York and has sufficient minimum contacts with New York through the promotion, marketing, and servicing of loans in New York, so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

4.	Venue is proper in this District under 28 U.S.C. § 1391(a)-(c), because Defendants transact business, maintains offices, and is otherwise found within this District.  Furthermore, the Defendants' unlawful acts giving rise to some of Plaintiff's claims occurred, and a substantial portion of the affected trade and commerce described herein, have been carried out in this District.

## THE PARTIES

5.	Plaintiff Rochelle Green is an individual and a resident of the State of New York.  Plaintiff Green owns the premises known as and located at 23 Auerbach Lane, Lawrence, New York 11559.  Plaintiff Green executed promissory notes to Defendants CMI and Nationstar, which are secured by mortgages against these premises.  Said mortgages are currently serviced by Defendants CMI and Nationstar.

6.      Defendant CMI is a domestic corporation organized under the laws of Delaware. Defendant CMI's main office and principal place of business is located at 1000 Technology Drive, Stop 140, O'Fallon, Missouri 63368.

7.      Defendant Nationstar is a domestic limited liability company organized under the laws of the United States.  Defendant Nationstar's main office and principal place of business is located at 350 Highland Drive, Lewisville, Texas 75067.

## STATEMENT OF FACTS

**A) Defendants' Fraudulent Loan Modification Process**

8.      In late 2008, the United States Department of the Treasury instituted the Home Affordable Modification Program ("HAMP") under the Emergency Economic Stabilization Act of 2008, and later under the Financial Stability Act of 2009, to encourage lenders to modify home mortgages, lower monthly payments, and reduce the burden on homeowners, helping them avoid foreclosure and financial ruin. Defendants received financing from the Treasury Department in exchange for their participation in the HAMP program.  Mortgage servicers participating in or subject to HAMP may not proceed with a foreclosure sale on a property in default until the borrower has been evaluated for HAMP modification eligibility. *See* Fed. Nat'l Mortg. Ass'n, *Announcement 09-05 R*, FANNIEMAE.COM, 16 (April 21, 2009), https://fanniemae.com/content/annoucement/0905.pdf.  Furthermore, all servicers of Fannie Mae or Freddie Mac owned loans are obligated to offer HAMP modifications to their respective eligible borrowers, regardless of whether such servicers participate in HAMP.  The same applies to the servicers of loans like Plaintiff Green's, which are backed by the Federal Housing Administration ("FHA-HAMP").  The program also includes the Home Affordable Refinance Program (HARP), which offers refinancing for properties that have lost significant value.

3

Defendants CMI and Nationstar further participate in the government-sponsored Home Affordable Foreclosure Alternatives program (HAFA), and the Home Affordable Unemployment Program (HAUP), which provides temporary relief for unemployed borrowers and later eligibility for the HAMP program. Defendants CMI and Nationstar are thus obligated to make extensive efforts to modify qualified loans to reduce the burden on borrowers.

9. Plaintiff's loans have been serviced by Defendants at all relevant times.

10. Defendants have implemented procedural safeguards to ensure that Plaintiff remains in default on her loans.

11. As Plaintiff experienced financial hardship, she was persuaded by Defendants' marketing to seek mortgage assistance, and requested loan modifications through Defendants beginning in 2010.

12. Defendants represented to Plaintiff that, following the submission and review of completed modification packages, Plaintiff would be given terms to make payments as part of a trial modification. If Plaintiff made the necessary monthly payments under the terms of the trial modification, a permanent modification would be perfected.

13. Plaintiff accepted Defendants' offers and worked to meet the terms required of her, expecting Defendants to be bound to perform their obligation of granting a modification.

14. Upon Plaintiff's acceptance of Defendants' loan modification offers through performance of the terms specified in Defendants' offer, contracts were formed, binding Defendants and their successors in interest. *See, e.g.*, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012); *Corvello v. Wells Fargo Bank, N.A.*, 728 F.3d 878 (9th Cir. 2013); *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224 (1st Cir. 2013).

15. Although Plaintiff operated in good faith to overcome Defendants' obstacles by attempting to meet conditions precedent of a modification agreement, Defendants rejected Plaintiff's modification efforts based on erroneous claims concerning Plaintiff's financial situation and nature of the loans. Plaintiff's denials are grounded in the failure of Defendants' loss mitigation representatives to conduct document review and financial analysis as mandated by Defendants' obligations under HAMP and other binding guidelines.

16. Defendants are directing Plaintiff towards foreclosure by rejecting modification applications through a supposed pre-screening modification review. Plaintiff was required to speak with representatives of Defendants, and asked cursory financial questions, before being systematically disqualified for modification, despite the quality of answers and information provided. Defendants rejected Plaintiff's modification attempts based on erroneous claims about Plaintiff's financial situation and nature of the loans.

17. Plaintiff Green contacted Defendants four times. When she first contacted Nationstar to request modification packages in 2010, Nationstar's agent dissuaded Plaintiff from applying, claiming that Plaintiff would not have qualified because she did not meet the requirements of any modification programs. CMI responded similarly. Were Defendants to conduct an actual financial analysis, and take into account all expenses and appropriate deductions, it would have resulted in appropriate modification. Defendants' superficial and erroneous financial review of Plaintiff Green's file resulted in a denial of modification and breach of the modification agreement.

18. Shortly thereafter, when Plaintiff again contacted Defendants for modification applications, she was again refused by both Defendants, this time stating that she would not be eligible for modification since she was not behind on her payment.

19. Defendants thus rejected Plaintiff multiple occasions, for two contradictory reasons. Moreover, each rejection served to steer Plaintiff towards foreclosure in their disregard for Plaintiff's financial difficulties.

20. Moreover, Defendants never provided Plaintiff a written explanation of the determination on her requests and remaining options, as is required under both HAMP and RESPA.

21. These denials were grounded in the failure of Defendants' loss mitigation representatives to conduct document review and financial analysis as mandated by Defendants' obligations under HAMP and other binding guidelines.

22. This prescreening process existed to reject modification applications without having to burden Defendants with a more thorough review of Plaintiff's financial applications. A proper review would demonstrate that Plaintiff did qualify for modification, and that Defendants disregarded actual information through their cursory and deficient analyses of Plaintiff's modification applications.

23. Despite Plaintiff's performance of conditions precedent to modification agreements, Defendants' practices led to the rejection of loan modifications.

24. Defendants had no intention to grant a modification, since it was not in Defendants' financial interest to do so despite their obligations.

**B) Defendants' Conflicts of Interest**

25. As a matter of common knowledge, mortgage loan servicers' compensation generally does not depend on the performance of the loans they service, and the complex pay structure creates incentives against modification, and in favor of foreclosure of borrowers' homes.

26. Mortgage servicers' primary fees are calculated as a monthly percentage of the principal balance of the loans in the loan portfolio which they service, so that modifications involving principal reduction directly reduce the servicers' compensation. Defendants, therefore, have an incentive not to offer borrowers in distress such modifications.

27. Even when mortgages are pooled and securitized, servicers retain most fees related to default, foreclosure, and post-foreclosure. These include late fees, insufficient funds fees, foreclosure service fees, appraisal fees, and even brokerage fees gained through the sale of foreclosed-upon properties. These fees, and others, create a strong pecuniary incentive to keep borrowers in default as long as possible, and eventually to foreclose on their homes. Defendants thus benefitted greatly from the collection of these fees.

28. In addition, servicers invest the "float" (funds held on deposit) and retain earnings on that investment. Therefore, amounts held in escrow or in debtor suspense are an additional source of revenue for the servicers."[1] Defendants thus have further incentive to steer Plaintiff towards foreclosure.

29. Additionally, as a matter of common knowledge, lenders regularly obtain insurance or other contractual relationships in which losses through foreclosure or short sale (*i.e.*, when the homeowner-mortgagor loses her home) are paid in whole or in part to Defendants, in addition to the amount it realizes in a foreclosure sale or short sale. There are various types of these complex financial vehicles, including Credit Default Swaps ("CDS"), and Collateralized Debt Obligations ("CDO"). Under both, the loss is determined by the outstanding amount of the loan as distinguished from what Defendants may have paid for the loans.

---

[1] *See In re Stewart*, 391 B.R. 327, 336 (Bankr. E.D. La. 2008) (providing overview of servicer compensation), *aff'd*, No. 08-3225, 2009 WL 2448054 (E.D. La. Aug. 7, 2009), *vacated on other grounds*, 647 F.3d 553 (5th Cir. 2011).

30. Under the CDS/CDO scheme, Defendants only receive reimbursements for their losses, in whole or in part, if the mortgaged property is sold through foreclosure sale or short sale, but not if the loan is modified, since modification does not qualify as default. Therefore, modification of loans that let Plaintiff stay in her home is not in Defendants' pecuniary interest, and Defendants therefore have a motive to evade the performance of their modification obligations.

31. Defendants thus have various conflicts of interest that provide them an incentive to negotiate with the Plaintiff in bad faith. Such incentives lead it to frustrate any rational purpose of the modification contract, as evidenced by Plaintiff's very applications.

32. Plaintiff suffered financial hardship resulting from the deteriorating economy, the decline in the market and rental value of real estate generally and the Plaintiff's real property specifically, as well as related reductions in income. Defendants have been aware of Plaintiff's difficulties concerning her mortgage obligations at all relevant times through information provided by the Plaintiff.

33. Plaintiff has the capacity to make monthly payments based on her note, if it was restructured with a principal amount more in line with the present value of the subject property and at a lower interest rate, in line with current market rates. Plaintiff should have an option to do so, giving Defendants an amount in value equal to or greater than the amount legitimately realized through the sale in foreclosure of the home securing the note, as foreclosure sales typically produce a sale price below the fair market value, and carry extra costs.

34. Under HAMP, servicers are required to conduct a Net Present Value calculation ("NPV") of the subject mortgage as modified, and as unmodified (*i.e.*, as sold through foreclosure.) When a modified principal has an NPV equal to, or greater than, the amount likely

to be obtained from sale in foreclosure, lenders must offer a modification. However, Defendants' pay structure produces a different profitability analysis for Defendants, as fees gained through default are often much more lucrative than those gained through modification, regardless of the NPV calculation.[2] This financial analysis further incentivizes Defendants against offering modifications, and applies to their in-house loan modification programs, as well.

35. Upon information and belief, Defendants have and apply no standards for the awarding of payouts to homeowners pursuant to subsequent settlements that Defendants had reached with the U.S. Government, in which modification-related wrongdoing was found following the establishment of HAMP. Defendants thus drive their inventory of loans into default and eventual foreclosure, allowing them to obtain fees, penalties, and payment on the undisclosed insurance taken out against the interests of the Plaintiff.

36. Defendants evaded requirements under any contract with Plaintiff, the U.S. Treasury Department, U.S. Department of Housing and Urban Development (HUD), custom and usage in the banking industry, and even their own representations to Plaintiff, to deal with Plaintiff fairly and in good faith towards reasonable loan modification agreements of financially troubled loans, which would allow Plaintiff to remain in her home.

37. Upon information and belief, Defendants have been operating fraudulent loan modification programs, purporting to offer the possibility of a loan modification agreement to the Plaintiff and other homeowners, while keeping them in default to enable Defendants to pursue foreclosure against those same homeowners.

---

[2] Where the servicer is not the investor in the loan, its incentive is different than that of the investor, since the servicer retains foreclosure fees, and does not suffer the losses.

38. Defendants require homeowners to go into default to be eligible for loan relief or modification. Defendants repudiated their obligations, frustrated Plaintiff's performance of the terms of their offers, and are directing the mortgaged home towards a sale in foreclosure.

39. Defendants sell the mortgaged residential properties at distress prices substantially below the fair market value, while cashing in on the various lucrative fees and penalties. This further incentivizes Defendants to remove Plaintiff from her home through foreclosure sale of the property, rather than giving homeowners a loan modification agreement to keep them in their homes, as Defendants invariably represent to Plaintiff through their communications and marketing materials.

40. This dual-track process that Defendants have pursued, and continues to pursue in their business dealings with Plaintiff is not, nor is it intended to be, a good faith attempt to perform their loan modification obligations. Instead, it is a ploy used by Defendants to convince Plaintiff that there is a fair opportunity for Plaintiff to obtain a reasonable loan modification agreement, when in fact there is no such opportunity.

41. Defendants thus dissuaded Plaintiff through misrepresentation for an extended period of time from seeking alternative refinancing, or selling her property at the highest possible price.

42. Upon learning of various improper practices and illegal abuses, Plaintiff submitted Qualified Written Requests ("QWRs") under the Real Estate Settlement Procedures Act ("RESPA"), 12 USC § 2605(e).

43. Such requests also satisfy the requirements for Notice of Error under RESPA, 12 CFR § 1024.35(a).

44. In this request, Plaintiff formally pointed to error and disputed the validity of her current debts with Defendants and requested all available information pertaining to the servicing of her loans to determine what misrepresentations, errors, and failures to disclose occurred, as well as whether the loan origination, accounting of payments and fees, and ownership details had been proper.

45. To date, far beyond the thirty to forty five day period prescribed for Notice of Error, and even beyond the sixty day period proscribed under Section 6 of RESPA, Defendants have failed to sufficiently comply with the QWRs in a meaningful way, or to attempt in any way to resolve the issues which Plaintiff raises herein. Nor have Defendants provided an adequate reason for their refusal to do so.

### COUNT I

### Breach of Contract

46. The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

47. Plaintiff held mortgages that were serviced by Defendants. After suffering financial difficulties and eventual default of the terms of Plaintiff's promissory notes, Plaintiff requested loan modifications from Defendants.

48. Defendants represented to Plaintiff that she could obtain modification pursuant to the completion of terms under a trial modification. Plaintiff accepted the modification offers.

49. Plaintiff attempted to meet all conditions precedent, but was intentionally frustrated from doing so by Defendants.

50. Defendants attempted to avoid providing proper modification terms following Plaintiff's acceptance of the offer, through shortcomings in their modification process, which

could only be explained by either the knowingly inconsistent and conflicting review of Plaintiff's file that Defendants used to their benefit, or a negligent failure of Defendants' loss mitigation representatives to adequately conduct financial analysis.

51.     Defendants had an obligation to properly modify Plaintiff's loans but breached the terms of their loan modification agreements with Plaintiff.  Defendants systematically deprived Plaintiff the benefits of the loan modifications while benefiting from the fees, penalties, and interest accrued through default.  These fees and penalties removed the incentive to work with Plaintiff to obtain modification, and instead supplied incentives to, *inter alia*, fail to allocate sufficient resources and to train competent and knowledgeable staff in order to ensure accurate and timely processing of loan modifications, and other failures described herein.

52.     Defendants have denied or failed to provide Plaintiff loan modification, and has instead generated profit for themselves by continuing to charge excessive late, default, and foreclosure fees and interest.

53.     As a direct and proximate result of Defendants' breaches of their loan modification agreements, Plaintiff did not receive the benefit of the bargains, suffered damages in the form of large amounts in fees and penalties, negative impact on her creditworthiness, and severe distress from the threat of foreclosure, in an amount to be determined at trial.

## COUNT II

### Breach of the Implied Covenant of Good Faith and Fair Dealing

54.     The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

55.     Every contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract, which requires that neither party do anything to infringe on the

other party's rights to the benefits of the agreements or to deprive the other party of the benefits of the contract.

56. Defendants breached the implied covenant of good faith and fair dealing contained in their loan modification agreements.

57. Defendants further breached the implied covenant of good faith and fair dealing by, *inter alia*:

>    A. failing to make a good faith effort to fulfill Defendants' contractual obligations, written and implied promises, and loan servicing functions;
>
>    B. knowingly allocating insufficient resources to train competent and knowledgeable staff in order to ensure accurate and timely processing of loan modification requests; and
>
>    C. demanding late fees, interest and other delinquency related fees from Plaintiff in excess of what she could reasonably pay.

58. As a direct result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiff suffered damages in an amount to be determined at trial.

## COUNT III

### Promissory Estoppel

59. The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

60. Defendants intentionally represented that Plaintiff could obtain loan modification, and that Plaintiff could make modified, reduced payments that would satisfy existing loan obligations for the terms set forth in the loan modification agreements, if she followed the requirements specified in Defendants' offer.

61. Defendants intentionally induced Plaintiff to rely on their representations concerning their loan modification programs and to make modification payments.

62. Plaintiff relied on the Defendants' representations to her detriment and suffered damages in the form of fees, penalties, and negative reporting of her creditworthiness, incurred throughout the time in which Plaintiff attempted to secure modification from Defendants. Plaintiff further refrained from seeking alternative means of curing these difficulties.

63. Plaintiff's reliance was reasonable in light of Defendants' representations regarding their loan modification programs.

## COUNT IV

### Fraudulent Concealment

64. The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

65. Defendants used fraud and artifice to keep Plaintiff in default on her mortgages by promising opportunities for loan modification when it had no intention of providing such permanent modification.

66. As long as Plaintiff remained in default, Defendants were able to collect various default fees and penalties, as well as accumulating interest, thereby profiting from denying a modification.

67. Defendants did not disclose to Plaintiff their motives to direct Plaintiff towards default on her mortgages rather than offer modification, after conveying to Plaintiff that one would be given.

68. Defendants should have disclosed these suppressed facts and circumstances described herein to Plaintiff. Such details were material because they were essential to

Plaintiff's analysis that would have been undertaken in determining her course of action to avoid foreclosure. Had Plaintiff known this information, she would have acted differently than without having this vital information concealed by Defendants.

69. Defendants were aware at the time of the suppression of information that these concealments would induce Plaintiff to act in a way that was injurious to Plaintiff, while at the same time being profitable and advantageous to Defendants.

70. By concealing this information, Defendants intended to induce Plaintiff to alter her position to her detriment.

71. In each of the foregoing occurrences, Defendants possessed and utilized their superior knowledge and bargaining position to the detriment of Plaintiff.

72. Plaintiff justifiably and reasonably relied on the fraudulent concealment created by Defendants' suppression of information.

73. Defendants' gain of such profits represents a windfall.

74. Defendants knowingly and willingly committed these wrongdoings against the Plaintiff as described herein and knowingly chose to deceive Plaintiff. These acts were malicious and performed with a wanton disregard for Plaintiff's legal rights. Plaintiff is therefore entitled to punitive damages.

## COUNT V

### Violations of 349 of the New York General Business Law

75. The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

76. Plaintiff is a "consumer" as defined in § 349 of the New York General Business Law.

77. Section 349 of the New York General Business Law provides a private right of action for violations generally specified in the Federal Trade Commission Act, 15 USC § 34(a). *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 NY2d 20, 26 (1995).

78. The activities of Defendants as alleged in the preceding causes of action constitute deceptive acts and practices in the conduct of Defendants' business and furnishing of services.

79. The Defendants committed fraud by misrepresenting material facts to Plaintiff, failing to state that conflicts of interest existed, in such a way that Defendants would have no interest in working with the Plaintiff in the event she needed a forbearance or modification agreement, despite Plaintiff's qualifications. This is one of the primary obligations of the servicer under law and industry custom and usage, and part of Defendants' implied covenant of good faith and fair dealing with the Plaintiff.

80. The activities as alleged are directed to hundreds of thousands of consumer-homeowners whose loans have been serviced by Defendants.

81. Defendants' acts and misrepresentations constitute acts, uses, or employment by Defendants and their agents of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, in violation of § 349 of New York's General Business Law, making deceptive and unfair acts and practices illegal.

82. The unfair and deceptive trade acts and practices of Defendants have directly, foreseeably, and proximately caused damages and injury to Plaintiff and consumers at large.

83. Plaintiff relied to her detriment on the deceptive acts and practices, and has no adequate remedy at law.

84. The activities described in the preceding causes of action are prohibited by § 349 of the New York General Business Law, and thus, entitle Plaintiff to damages and relief as set forth in said New York General Business Law, with any other and further relief as this Court deems just and proper.

85. Section 349(h) of the New York General Business Law provides:

> (h) In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

86. Under § 349(h), Plaintiff is entitled to and requests a preliminary and permanent injunction against Defendants to order them to stop these unlawful practices, and for an award of actual damages caused to the Plaintiff, an amount to be determined by the Court, and $1,000 in increased damages upon a finding that Defendants acted willfully and knowingly to violate this provision of law. Also, Plaintiff is entitled to an award of attorney's fees and any other and further relief as this Court deems just and proper.

## COUNT VI

### Unjust Enrichment

87.     The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

88.     Through the conduct described herein, Defendants were unjustly enriched at the expense of Plaintiff.

89.     By preventing Plaintiff from making reduced monthly payments, Defendants caused Plaintiff's debt to increase, and further interest to accrue on the loan principals.

90.     The longer the modification application periods lasted, as well as the time between multiple applications that were destined to be rejected, the more Plaintiff would owe Defendants.  Plaintiff thus incurred a detriment and Defendants gained a benefit.  Defendants would be unjustly enriched if they were allowed to keep these ill-gotten gains acquired as a result of their wrongful conduct.

91.     Defendants were merely trying to strip as much equity as possible from the Plaintiff before taking her home through eventual foreclosure, despite Plaintiff's completion of requirements pursuant to a modification contract.

92.     To permit the Defendants to retain their unjust gains would be against equity and good conscience, and would ratify the illegal actions taken by the Defendants to the detriment of the Plaintiff in an amount to be determined at trial.

## COUNT VII

### Violations of the Real Estate Settlement Procedures Act

93.     The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

94. The subject transaction described above is a federally-related mortgage loan as defined in 12 USC § 2602(1), and therefore are subject to the Real Estate Settlement Procedures Act (hereinafter "RESPA"), 12 USC §§ 2601-2617.

95. Defendants acted in defiance of 12 USC § 2605(e) by failing to fully respond to inquiries submitted in Plaintiff's Qualified Written Request within the sixty-day period provided therein.

96. Defendants did not sufficiently provide the information requested to allow Plaintiff to conduct her own investigation into the matters, nor provided an adequate explanation for their refusal to do so.

97. Defendants also acted in defiance of 12 CFR § 1024.35(e)(3) by failing to adequately respond to Plaintiff's Notices of Error within thirty-days.

98. Defendants also acted in defiance of 12 CFR § 1024.41(c) by failing to provide written notice of the determination in Plaintiff's applications for loan modification, and the remaining options available to Plaintiff.

99. As a proximate result of Defendants' violations, Plaintiff has suffered financial loss and severe mental anguish and emotional distress over facing the loss of her home through foreclosure.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff prays the Court for the following relief against Defendant:

A. An order declaring that Defendants' alleged acts and practices constitute a breach of contract;

B. An order for Defendants' specific performance of their contractual obligations together with other relief required by contract law;

C. An order declaring that Defendants are required under the doctrine of promissory estoppel to modify Plaintiff's loans in accordance with Defendants' representations;

D. Restitution to Plaintiff and actual damages for injuries suffered by Plaintiff including payments and property equity not entitled to be received by Defendants;

E. Restitution to Plaintiff for mental anguish and emotional distress suffered by Plaintiff as a result of Defendants' fraudulent modification practice which exists to direct borrowers towards foreclosure;

F. Actual and statutory damages pursuant to § 349 of the New York General Business Law;

G. Actual damages resulting from Defendants' RESPA violations and additional damages as the Court may allow in an amount not to exceed $2,000.00, for violations of 12 USC § 2605(e); and

H. Reasonable attorney's fees and costs of this action, statutory pre-judgment interest, and such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury to the extent authorized by law.

Dated: August 11, 2014
Brooklyn, New York

_____
Michael E. Herskowitz, Esq.
*Of Counsel to*
THE HOFFMAN LAW GROUP, P.A.
1999 Flatbush Avenue, Suite 201
Brooklyn, New York 11234
Tel: (718) 998-5088

*Attorneys for the Plaintiff*